## UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF RHODE ISLAND

|  |  |
|---|---|
| HYUN CHOI, ANNA HOUSE, and AMY PHAM, individually and on behalf of all others similarly situated,<br><br>     Plaintiffs,<br><br> v.<br><br>BROWN UNIVERSITY and THE CORPORATION OF BROWN UNIVERSITY,<br>     Defendants. | C.A. No. 20-cv-00191-MSM-LDA |

## MOTION TO DISMISS
## THE FIRST AMENDED CLASS ACTION COMPLAINT

Pursuant to 12(b)(6) of the Federal Rules of Civil Procedure, and for the reasons set forth in the accompanying Memorandum in Support of Brown University's Motion to Dismiss the First Amended Class Action Complaint, Defendants Brown University and The Corporation of Brown University (collectively "Brown") move to dismiss with prejudice Plaintiffs' First Amended Class Action Complaint for failure to state a claim.

Brown respectfully requests oral argument on this Motion, and estimates that one hour will be necessary to address the arguments raised in the Memorandum.

Date:  August 24, 2020

Respectfully submitted,

By: _____
Mark S. Levinstein (*pro hac vice*)
Amanda M. MacDonald (*pro hac vice*)
WILLIAMS & CONNOLLY LLP
725 Twelfth Street, N.W.
Washington, DC  20005
Telephone: (202) 434-5000
Facsimile:  (202) 434-5029
mlevinstein@wc.com
amacdonald@wc.com

-and-

/s/ *Robert C. Corrente*
Robert C. Corrente (No. 2632)
Staci Kolb (No. 5451)
WHELAN CORRENTE & FLANDERS
LLP
100 Westminster Street, Suite 710
Providence, RI  02903
Telephone:  (401) 270-4500
Facsimile:  (401) 270-3760
rcorrente@whelancorrente.com
skolb@whelancorrente.com

*Attorneys for Defendants*

**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND**

| | |
|---|---|
| HYUN CHOI, ANNA HOUSE, and AMY PHAM, individually and on behalf of all others similarly situated,<br><br>       Plaintiffs,<br><br>  v.<br><br>BROWN UNIVERSITY and THE CORPORATION OF BROWN UNIVERSITY,<br>       Defendants. | C.A. No. 20-cv-00191-MSM-LDA |

**MEMORANDUM IN SUPPORT OF
BROWN UNIVERSITY'S MOTION TO DISMISS
<u>THE FIRST AMENDED CLASS ACTION COMPLAINT</u>**

## TABLE OF CONTENTS

INTRODUCTION ……………………………………………………………….. 1

LEGAL STANDARD …………………………………………………...……….. 4

ARGUMENT ……………………………………………………...……… 4

I.  Plaintiffs' "Quality of Education" Allegations Do Not State a Valid Claim ………..…… 4

II.  Plaintiffs Do Not State a Claim for Breach of Contract ……………………..…..…….10

    A.  No Breach of an Express Promise …………………………………....……… 10

    B.  No Breach of an Implied Promise ……………………………….…………… 15

III.  Plaintiffs Do Not State a Claim for Unjust Enrichment ………………...………… 17

IV.  Plaintiffs Do Not State a Claim for Conversion ………………………….……... 18

CONCLUSION ……………………………………………………… 19

# TABLE OF AUTHORITIES

## CASES

*Adams v. Antonelli College*, 304 F. Supp. 3d 656 (S.D. Ohio 2018)................................5

*Alex & Ani, LLC v. Elite Level Consulting, LLC*, 31 F. Supp. 3d 365 (D.R.I. 2014)...................18

*Alsides v. Brown Institute, Ltd*, 592 N.W.2d 468 (Minn. Ct. App. 1999) ......................6

*Ashcroft v. Iqbal*, 556 U.S. 662 (2009)........................................................4

*Barneby v. New England School of Montessori, LLC*, No. AANCV156019330S, 2016
    WL 3768928 (Conn. Super. Ct. June 9, 2016)................................................5

*Bass ex rel. Bass v. Miss Porter's School*, 738 F. Supp. 2d 307 (D. Conn. 2010) ........5, 10, 13, 15

*Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007)....................................4

*Bond Opportunity Fund II, LLC v. Heffernan*, 340 F. Supp. 2d 146 (D.R.I. 2004) .....................20

*Brooks v. AIG SunAmerica Life Assurance Co.*, 480 F.3d 579 (1st Cir. 2007)............................10

*Buck v American Airlines*, 476 F.3d 29 (1st Cir. 2007)........................................10

*Café La France, Inc. v. Schneider Securities, Inc.*, 281 F. Supp. 2d 361 (D.R.I. 2003) ..............17

*Cazabat v. Metropolitan Property & Casualty Insurance Co.*, No. C.A. KC99-0544, 2000
    WL 1910089 (R.I. Super. Ct. Apr. 24, 2000) ...........................................17

*Ciampi v. Zuczek*, 598 F. Supp. 2d 257 (D.R.I. 2009)........................................17

*Cuesnongle v. Ramos*, 713 F.2d 881 (1st Cir. 1983) ....................................13

*DeChristofaro v. Machala*, 685 A.2d 258 (R.I. 1996).......................................19

*Doe v. Brown University*, 166 F. Supp. 3d 177 (D.R.I. 2016)...........................11, 13, 16, 17, 18

*Doe v. Brown University*, 209 F. Supp. 3d 460 (D.R.I. 2016).......................................9

*Doyle v. Hasbro, Inc.*, 103 F.3d 186 (1st Cir. 1996) ..........................................10

*Fuscellaro v. Industrial National Corp.*, 368 A.2d 1227 (R.I. 1977)...........................18

*G. v. Fay School*, 931 F.3d 1 (1st Cir. 2019) ................................................14

*Gally v. Columbia University*, 22 F. Supp. 2d 199 (S.D.N.Y. 1998) .................................5, 16, 18

*Gillis v. Principia Corp.*, 832 F.3d 865 (8th Cir. 2016) ..........................................5, 14

*Glassman v. Computervision Corp.*, 90 F.3d 617 (1st Cir. 1996) ................................................19

*Gorman v. St. Raphael Academy*, 853 A.2d 28 (R.I. 2004)................................................3, 8, 9, 13

*Gupta v. New Britain Hospital*, 687 A.2d 111 (Conn. 1996) ........................................................6

*Hasbro, Inc. v. Mikohn Gaming Corp.*, 491 F. Supp. 2d 256 (D.R.I. 2007) ................................17

*Hunter v. Board of Education of Montgomery County*, 439 A.2d 582 (Md. 1982)........................6

*Mangla v. Brown Univ.*, 135 F.3d 80 (1st Cir. 1998) ....................................................9, 11, 15, 16

*Mayale-Eke v. Merrill Lynch*, 754 F. Supp. 2d 372 (D.R.I. 2010) ................................................4

*McMillin v. Lincoln Memorial University*, No. E2010-01190-COA-R3-CV, 2011 WL
    1662544 (Tenn. Ct. App. May 3, 2011)..................................................................................6, 7

*Mehan v. Gershkoff*, 230 A.2d 867 (R.I. 1967) ...........................................................................17

*Montecalvo v. Mandarelli*, 682 A.2d 918 (R.I. 1996) ..................................................................18

*Opella v. Opella*, 896 A.2d 714 (R.I. 2006) .................................................................................15

*Papelino v. Albany College of Pharmacy of Union University*, 633 F.3d 81 (2d Cir. 2011) ....5, 16

*Paynter v. New York University*, 319 N.Y.S.2d 893 (N.Y. App. Div. 1971) ...........................7, 13

*R & B Elec. Co. v. Amco Construction Co.*, 471 A.2d 1351 (R.I. 1984)......................................17

*Regents of University of California v. Bakke*, 438 U.S. 265 (1978) ................................................6

*Regents of University of Michigan v. Ewing*, 474 U.S. 214 (1985)............................................6, 9

*Rocha v. Wells Fargo Bank, N.A.*, No. 16-cv-600, 2018 WL 1934191 (D.R.I. Apr. 24,
    2018) ....................................................................................................................................17, 18

*Roe v. Loyola University New Orleans*, No. 07-cv-1828, 2007 WL 4219174 (E.D. La.
    Nov. 26, 2007) ........................................................................................................................7, 8

*Ross v. Creighton University*, 957 F.2d 410 (7th Cir. 1992) ................................................5, 6, 7

*Shin v. Massachusetts Institute of Technology*, No. 020403, 2005 WL 1869101 (Mass.
    Super. Ct. June 27, 2005).........................................................................................................14

*Wickstrom v. North Idaho College*, 725 P.2d 155 (Idaho 1986)....................................................5

*Winter v. American Institute of Medical Sciences & Education*, 242 F. Supp. 3d 206
    (S.D.N.Y. 2017)..........................................................................................................................5

## OTHER AUTHORITIES

Black's Law Dictionary (11th ed. 2019) ...........................................................................19

Rhode Island Secretary of State Historic Corporate Catalog, ID No. 000033291 .........................1

Richard A. Lord, Williston on Contracts § 68:5 (4th ed. 2004) ....................................................18

Richard M. Locke, *To Brown Campus: Positive COVID-19 case; Immediate steps to reduce community exposure* (March 14, 2020), https://healthy.brown.edu/updates/brown-campus-positive-covid-19-case-immediate-steps-reduce-community-exposure ...........................................................................................3

Ronald B. Standler, *Educational Malpractice Law in the U.S.A.* (2013) ......................................5

The Charter of Brown University (1945) ...........................................................................1

## INTRODUCTION

From the outset of the Covid-19 pandemic, Brown University[1] has made the health and safety of students, faculty and staff its first priority.  Even before Governor Raimondo issued her first stay-at-home order on March 28, 2020, Brown President Christine H. Paxson, in consultation with experts at the Warren Alpert Medical School, acted to restrict the size of campus gatherings and to require self-isolation by members of the university community returning from China, Iran, Italy, and South Korea.[2]  On March 12, President Paxson announced all academic instruction would move online and directed students to make arrangements to leave campus by March 22—a date she advanced to March 17 when Brown reported its first case of

---

[1]   The First Amended Class Action Complaint ("Compl.") incorrectly and redundantly names "The Corporation of Brown University" as a defendant.  Brown University's Trustees and Fellows ("the Corporation") and Brown University are coterminous and are not separate and distinct legal entities.  By the colonial charter of 1764, the Trustees and Fellows "shall be forever hereafter one body corporate and politic, in fact and name to be known in law by the name of Trustees and Fellows of the College or University in the English Colony of Rhode Island and Providence Plantations, in New England, in America."  *See* The Charter of Brown University, 7 (1945) (*available at* https://www.brown.edu/about/administration/corporation/ sites/brown.edu.about.administration.corporation/files/uploads/charter-of-brown-university.pdf).  In 1804, the name of the institution was changed from the above to Brown University in Providence in the State of Rhode Island and Providence Plantations, and since 2008 it has been registered fictitiously as Brown University.  See R.I. Secretary of State Historic Corporate Catalog, ID No. 000033291 (*available at* http://business.sos.ri.gov/ CorpWeb/CorpSearch/CorpSummary.aspx?FEIN=000033291&SEARCH_TYPE=1).  It is by that name that the institution may sue and be sued.

[2]   Compl. ¶ 64, Dkt. 22 (Aug. 6, 2020).

1

Covid-19.[3]  All these steps, Plaintiffs acknowledge, were "justified" in light of the threat posed by the rapid and unpredictable spread of the virus.[4]

The Brown faculty and staff used spring break to prepare for the transition to remote instruction.  On March 30, when classes resumed, four weeks of classes remained, with exams to follow.[5]  Brown's students—including, by their own allegations, each of the three named Plaintiffs—were able to complete their course work, take exams, and earn the expected credits toward their degrees.

Plaintiffs do not identify any course that was not completed, any exam that was not conducted, or any circumstance where they or any other student had to withdraw or otherwise forgo earning credits toward their degree as a result of the Covid-19 pandemic.  To the contrary, one Plaintiff earned her degree and graduated, while the other two completed the semester and have now re-enrolled in Brown for the Fall.  Compl. ¶¶ 11–13.  Having remained enrolled, completed the semester and their coursework, earned their course credits and advanced toward their degrees, Plaintiffs are left to complain only that they believe the education they received in the final weeks of the semester was not of the same quality as it would have been through in-person, on-campus instruction.  This, they claim, entitles them to a partial refund of tuition.[6]

---

[3]   *Id*. ¶¶ 66–67.  For those students who were unable to leave campus because of international travel restrictions or otherwise, Brown implemented additional safety measures so that it could continue to house them on campus.

[4]   *Id*. ¶ 69 ("Though the reasons for such closures are justified the fact remains that such closures and cancellations present significant loss to Plaintiffs and Class Members.").

[5]   Compl. Ex. A at 91–92, Dkt. 22-1 (Aug. 6, 2020).

[6]   Plaintiffs also seek "fee refunds and/or room and board refunds," Compl. ¶¶ 106, 119, but they acknowledge that Brown already partially refunded those fees that had been paid and that would not (in most cases) be used—room and board, meals, and the recreation fee, *id*. ¶¶ 84–86.  The Complaint does not allege any basis for second-guessing the amount of these pro rata refunds.  In addition to these refunds, Brown provided additional financial support to

2

As we explain below, Plaintiffs fail to state a valid claim for relief:

- For a half century or more, courts across the country have dismissed as non-justiciable claims concerning the quality of the education provided by a school or university—claims that some courts call "educational malpractice" claims. The Rhode Island Supreme Court embraced the reasoning of these decisions in *Gorman v. St. Raphael Academy*, 853 A.2d 28 (R.I. 2004), recognizing that the student-private school (or private university) contractual relationship is "unique" in that courts must accord school administrators "broad discretion to meet its educational … responsibilities," including "the right to modify … academic rules and regulations." *Id*. at 34.

- The 2019-20 University Bulletin ("Bulletin"), which Plaintiffs identify as the principal source of Brown's alleged contractual obligation to provide in-person, on-campus instruction, states expressly that it does not create contractual obligations.

- The 850-page Bulletin, in any event, does not contain any specific, identifiable promise to provide in-person, on-campus instruction. Plaintiffs point to no such language, and there is none.

- As a general rule, the implied contract that governs the student-university relationship provides only that, if the student completes the requisite courses and fulfills any additional requirements, the university will award him or her a degree. There is no allegation that Brown breached that implied contract, and it did not.

- Insofar as official university publications may establish reasonable expectations about the mutual obligations that constitute the implied contract between Brown students and the university, the Bulletin defines the limits of those reasonable expectations regarding tuition. The Bulletin clearly and specifically provides as to tuition that the university will (i) grant credit for up to five courses per semester for successfully completed course work, and (ii) provide a partial refund only in the event a student withdraws during the first five weeks of a semester.[7] Brown did so: it provided full credit for successfully completed course work in the Spring 2020 semester, and no Plaintiff withdrew as a result of the Covid-19 pandemic. The Complaint does not allege otherwise.

- Because their relationship is a contractual one under clear Rhode Island law, Plaintiffs cannot plead in the alternative a quasi-contract claim for unjust enrichment. In any event, Brown was not unjustly enriched. It certainly did not "profit[] from COVID-19,"

---

students on financial aid to defray the costs of travel and relocation during the transition to remote learning. *See* Richard M. Locke, *To Brown Campus: Positive COVID-19 case; Immediate steps to reduce community exposure* (March 14, 2020), https://healthy.brown.edu/updates/brown-campus-positive-covid-19-case-immediate-steps-reduce-community-exposure.

[7]    Ex. A at 860–61.

3

and the Complaint does not include any factual allegations that show it did. [8]  There is no allegation that the pandemic or the movement to online classes reduced Brown's costs (and, in fact, the opposite is true).

- Plaintiffs cannot plead a conversion claim without identifying personal property Brown allegedly converted and without identifying any specific money Brown was required to keep separate and apart for a particular purpose.  The Complaint does neither.

The Covid-19 virus has disrupted all our lives.  Notwithstanding that disruption, Brown's students, faculty and staff displayed admirable flexibility and perseverance in completing the semester.  Teaching and learning for the final weeks of the semester took a different form—as it had to—but that change does not give rise to cognizable legal claims.

## LEGAL STANDARD

To survive a motion to dismiss, a complaint must allege facts that "raise a right to relief above the speculative level."  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007).  Plaintiffs' factual allegations must be pled with enough specificity that their claim crosses "the line from conceivable to plausible."  *Id.* at 570.  "[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not shown—that the pleader is entitled to relief."  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (internal quotation marks and alterations omitted).  Factual allegations in the complaint are assumed to be true, but the court is not bound to accept as true legal conclusions couched as factual allegations.  *Mayale-Eke v. Merrill Lynch*, 754 F. Supp. 2d 372, 375–76 (D.R.I. 2010).

## ARGUMENT

## I.    Plaintiffs' "Quality of Education" Allegations Do Not State a Valid Claim.

Plaintiffs' legal claim—whether couched as breach of express or implied contract, unjust enrichment, or conversion—rests on the contention that, once the pandemic required Brown to

---

[8]    Compl. ¶ 7.

suspend on-campus activities, Plaintiffs received an inferior education.  To that end, Plaintiffs

allege that, "while students enrolled and paid Defendants for a comprehensive on-campus

academic experience, ***Defendants instead offer[ed] Plaintiffs … something far less***:  a limited

online experience presented by Google or Zoom, void of face-to-face faculty and peer

interaction, separated from program resources, and barred from facilities vital to a well-rounded,

on-campus educational experience."[9]

Such claims are for "educational malpractice."  *Adams v. Antonelli College*, 304 F. Supp.

3d 656, 664–65 (S.D. Ohio 2018) ("A claim that educational services provided were inadequate

constitutes a claim for educational malpractice.").[10]  Over the past half century, courts across the

country have almost unanimously held that such claims for educational malpractice are not

cognizable.  Ronald B. Standler, *Educational Malpractice Law in the U.S.A.*, 43 (2013) ("[I]t is

now very well established law that educational malpractice is *not* a viable tort.");[11] *Ross v.

Creighton Univ.*, 957 F.2d 410, 414 (7th Cir. 1992) ("the overwhelming majority of states that

---

[9]    Compl. ¶ 2.  All emphases are added unless otherwise indicated.

[10]   Courts routinely reject "educational malpractice" claims whether, as here, a plaintiff attempts to plead them as breach of contract claims, *see, e.g.*, *Gillis v. Principia Corp.*, 832 F.3d 865, 872 (8th Cir. 2016) (Courts do not recognize educational malpractice claims "either in tort or contract, on the premise that universities must be allowed the flexibility to manage themselves and correct their own mistakes." (quotation marks and alteration omitted)); *Papelino v. Albany College of Pharmacy of Union Univ.*, 633 F.3d 81, 93–94 (2d Cir. 2011); *Winter v. Am. Institute of Med. Scis. & Educ.*, 242 F. Supp. 3d 206, 222–24 (S.D.N.Y. 2017); *Bass ex rel. Bass v. Miss Porter's Sch.*, 738 F. Supp. 2d 307, 320 (D. Conn. 2010); *Gally v. Columbia Univ.*, 22 F. Supp. 2d. 199, 206–07 (S.D.N.Y. 1998); *Wickstrom v. N. Idaho College*, 725 P.2d 155, 158 & n.1 (Idaho 1986), or unjust enrichment claims, *see Barneby v. New England Sch. of Montessori, LLC*, No. AANCV156019330S, 2016 WL 3768928, at *3 (Conn. Super. Ct. June 9, 2016) (striking the unjust enrichment claim "premised on the defendant being unjustly enriched because the plaintiffs were deprived of the 'quality educational opportunities' expected under the parties' contract").

[11]   *Available at* http://www.rbs2.com/edumal3.pdf.

have considered this type of claim have rejected it" (citing decisions from eleven states));

*McMillin v. Lincoln Mem'l Univ.*, No. E2010-01190-COA-R3-CV, 2011 WL 1662544, at *6

(Tenn. Ct. App. May 3, 2011) ("Generally, educational malpractice is not recognized by courts

as a cognizable claim."); *Hunter v. Bd. of Educ.*, 439 A.2d 582, 583 (Md. 1982) ("[S]o-called

'educational malpractice' claims have been unanimously rejected by those few jurisdictions

considering the topic."); *Gupta v. New Britain Hosp.*, 687 A.2d 111, 119 (Conn. 1996)

("[C]ourts have almost universally held that claims of 'educational malpractice' are not

cognizable." (footnote omitted))

　　　　This rule has roots in the special protection afforded academic freedom, which, "though

not a specifically enumerated constitutional right, long has been viewed as a special concern of

the First Amendment." *Regents of Univ. of Cal. v. Bakke*, 438 U.S. 265, 312 (1978); *Regents of

Univ. of Mich. v. Ewing*, 474 U.S. 214, 226 (1985).  This freedom concerns the right of a

university "to make its own judgments as to education," *Bakke*, 438 U.S. at 312, and renders

inappropriate judicial review of "the substance of the multitude of academic decisions that are

made daily by faculty members," *Ewing*, 474 U.S. at 226.

　　　　The rule is also supported by pragmatic policy considerations.  First, absent an express

contractual term, courts have recognized that there is no standard by which to evaluate educators,

or the quality of the education they provide.[12]  Second, there is no standard by which to measure

damages (i.e., the difference between the bargained-for and allegedly lower-quality education).[13]

And, third, recognizing a claim for educational malpractice would invite a flood of litigation by

---

[12]　*See Ross*, 957 F.2d at 416–17.

[13]　*Hunter*, 439 A.2d at 584–85; *Alsides v. Brown Inst., Ltd.*, 592 N.W.2d 468, 472 (Minn. Ct.
App. 1999).

students dissatisfied with their educational experience (including, for example, dissatisfaction with grades received or their ability to secure employment).[14]

Accordingly, whether invoking the prohibition of educational malpractice claims or on other grounds, courts routinely dismiss claims concerning the quality of education provided and, more generally, matters that involve academic judgment.  Two cases that illustrate this rule are particularly apt.  In *Paynter v. New York University*, a father sued NYU for "a refund of tuition for instruction time claimed to have been lost by his son because classes were suspended on May 7, 1970, following anti-war student demonstrations … after the announcement that American troops had been ordered into Cambodia and the tragic events at Kent State University."  319 N.Y.S.2d 893, 893 (N.Y. App. Div. 1971).  The New York Appellate Division reversed the judgment for plaintiff for partial recovery of tuition, holding that the trial court erred "in substituting its judgment for that of the University administrators and in concluding that the University was unjustified in suspending classes for the time remaining in the school year."  *Id.* at 894.  "[W]hile in a strict sense, a student contracts with a college or university for a number of courses to be given during the academic year," the court reasoned, "the services rendered by the university cannot be measured by the time spent in a classroom," and "the [student-university] relationship permit[s] the implication that … the college may make minor changes in this regard."  *Id.*

Similarly, in *Roe v. Loyola University New Orleans*, No. 07-cv-1828, 2007 WL 4219174 (E.D. La. Nov. 26, 2007), Hurricane Katrina forced Loyola to close for the Fall 2005 semester. In response, the university "developed a policy whereby [its law] students would be able to attend classes … at other ABA-accredited law schools and receive full credit for those courses

---

[14]   *See Ross*, 957 F.2d at 416–17; *McMillin*, 2011 WL 1662544, at *6.

toward their Loyola … degrees, provided the students paid their tuition for the Fall 2005

semester to [Loyola]." *Id*. at *1. The court rejected the plaintiff's claim that "he paid Loyola for

education and services during the Fall 2005 semester and Loyola did not provide such to him,"

finding that the university had discretion to provide for visiting status at another school and that

"because of the special policy adopted by Loyola … plaintiff was able to attend classes at SMU,

receive those credits toward his Loyola degree, and graduate without delay." *Id*. at *2.

Here, *a fortiori*, Plaintiffs have no claim. Brown did not cancel classes for the remainder

of the semester, as NYU did in 1970, nor did it cease operations and send students to another

university, as Hurricane Katrina forced Loyola to do. Under the difficult circumstances created

by the pandemic—and ultimately subject to a stay-at-home order issued by the Governor that

prevented on-campus classes—the Brown administration made provisions to fulfill the

university's mission. The Brown faculty continued to teach, and students (including each

Plaintiff) continued to take their courses; they completed the Spring 2020 semester and received

full credit toward their degrees.

Although the Rhode Island Supreme Court did not refer to "educational malpractice"

claims as such, the Court in *Gorman v. St. Raphael Academy*, 853 A.2d 28 (R.I. 2004), embraced

the reasoning of cases like *Paynter v. New York University* and *Roe v. Loyola University New*

*Orleans*. In *Gorman*, the issue was St. Raphael's adoption of a hair-length regulation and the

plaintiff's threatened expulsion for violating the regulation. The Supreme Court noted that the

student-university relationship is "essentially contractual," but that "numerous jurisdictions"

have recognized that "the relationship has unique qualities, and thus does not require strict

adherence to contract law." *Id*. at 34. What makes the relationship unique is that a school

administration must have "broad discretion to meet its educational … responsibilities," including

8

"the right to modify … academic rules and regulations." *Id*. Thus, "[c]ourts normally construe educational contracts to allow the school administration flexibility in meeting its educational responsibilities." *Id*.[15] In *Doe v. Brown University*, 209 F. Supp. 3d 460 (D.R.I. 2016), citing *Gorman*, this Court granted summary judgment in a case alleging that Brown breached its contract with the plaintiff in imposing discipline for cheating. The Court noted the "unique qualities" of student-university contracts that require courts to construe them so as to leave school administrations "broad discretion to meet its educational … responsibilities," and made the connection between *Gorman* and the line of authority that grounds deference to academic judgment in First Amendment concerns for academic freedom. *Id*. at 472 (quoting *Ewing*, 474 U.S. at 225 ("Plainly, [judges] may not override [the faculty's professional judgment] unless it is such a substantial departure from accepted academic norms as to demonstrate that the person … did not actually exercise professional judgment."), and *Mangla v. Brown Univ.*, 135 F.3d 80, 84 (1st Cir. 1998) ("Courts have long recognized that matters of academic judgment are generally better left to the educational institutions than to the judiciary.")).

The pandemic confronted Brown with decisions that went to the very core of the "broad discretion," "flexibility in meeting its educational responsibilities," and "right to modify … academic rules and regulations" recognized by the Rhode Island Supreme Court in *Gorman*. That decision removes from judicial oversight Brown's academic decision regarding what to teach and how to teach it.[16]

---

[15]  The Court in *Gorman* reversed the Superior Court's entry of a permanent injunction in favor of the plaintiff.

[16]  *Gorman* likewise would protect a decision, like that made in *Paynter*, about whether to continue to teach at all or that made in *Roe v. Loyola*, about whether to send students somewhere else for in-person teaching by another school's faculty (although, because Brown

## II.     Plaintiffs Do Not State a Claim for Breach of Contract.

To state a claim for breach of contract, a plaintiff must as an "irreducible minimum" "explain what obligations were imposed on each of the parties by the alleged contract." *Buck v. Am. Airlines*, 476 F.3d 29, 38 (1st Cir. 2007) (quoting *Doyle v. Hasbro, Inc.*, 103 F.3d 186, 194–95 (1st Cir. 1996)).  A plaintiff must "describ[e] with substantial certainty, the specific contractual promise the defendant failed to keep." *Brooks v. AIG SunAmerica Life Assurance Co.*, 480 F.3d 579, 586 (1st Cir. 2007) (quotation omitted); *see also Doyle*, 103 F.3d at 194–95. Plaintiffs fail this basic pleading requirement because they do not identify any contractual term that obligates Brown to provide in-person, on-campus instruction.  What Brown agrees to provide in return for tuition is up to five courses of instruction per semester—with no promise as to the mode of instruction—plus the accompanying credits toward earning a degree (if the student receives passing grades).  Brown met that obligation, and Plaintiffs do not allege otherwise.

### A.     No Breach of an Express Promise

Some courts recognize exceptions to the rule that educational malpractice claims are not permitted.  One exception is for a "specific, identifiable promise." *Bass*, 738 F. Supp. 2d at 320 (applying Connecticut law).[17]  Plaintiffs allege—without citation—that "[a] material term of the bargain and contractual relationship, whether express or implied, was that Defendants would provide on-campus courses and access [to] on-campus facilities and services."  Compl. ¶ 93.  But

---

did provide continued instruction by the Brown faculty and completed all courses, this case does not present those issues).

[17]  The other exception is for arbitrary or bad faith conduct.  That exception is irrelevant here, because Plaintiffs agree that the closures by the Governor and implemented by Brown were "justified."  Compl. ¶ 69 ("Though the reasons for such closures are justified the fact remains that such closures and cancellations present significant loss to Plaintiffs.").

they do not identify any such promise in any document, let alone one that could be considered a contract between themselves and Brown.[18]

**The Bulletin**.  Plaintiffs allege that the Bulletin "lays out the terms of the contract between Brown and Plaintiffs and Class Members." *Id.* ¶ 50.  The Bulletin provides general information about the University and its facilities, calendar, divisions, departments, programs, centers, institutes, leadership, faculty, and anticipated course offerings for the academic year.  It also contains various university policies.  The 850-page Bulletin is not a contract, however.  It expressly disclaims—in its first two sentences—that it serves as a contract:  "This bulletin is intended to provide only general information concerning Brown University ***and is not in any manner contractually binding***.  The information contained herein is subject to revision and change at any time."  Ex. A  at 2.

The Bulletin does include specific provisions regarding the payment and refund of tuition, and these provisions—entirely ignored in the Complaint—contradict Plaintiffs' allegations of breach.[19]  First, the Bulletin provides that tuition payments entitle a full-time student to enroll in three, four, or five courses per semester.[20]  Brown did not breach this

---

18  "The terms of the contract may include statements provided in student manuals and registration materials," *Mangla*, 135 F.3d at 83, as well as "language found in the university's student handbook," *Doe v. Brown Univ.*, 166 F. Supp. 3d 177, 191 (D.R.I. 2016).

19  *See* Part II.B, *infra*.

20  Ex. A at 859–61.  The analysis for other fees, such as room and board and meal plans, is the same.  Plaintiffs allege that fees were charged "for Defendants to provide in-person instruction, access to Defendants' facilities, and/or housing services."  Compl. ¶ 92.  But the Bulletin states that the "University reserves the right to change the rates that apply to all students whenever it is deemed advisable" and describes the circumstances in which certain fees may be refunded.  Ex. A at 860–61.  There is no allegation that Brown breached these provisions.  And, in any event, Plaintiffs acknowledge that they received partial refunds of room and board, meal plan, and recreation fees.  Compl. ¶ 84.

provision, and Plaintiffs do not claim that it did.  There is no allegation that Brown prevented students from enrolling in the requisite number of classes, completing the course work, and obtaining credit toward their degrees.  Indeed, every Plaintiff did so, and one Plaintiff graduated with a Brown degree.  Second, the Bulletin provides for a refund of tuition only if a student "leaves the University" or "changes his/her enrollment status during a semester … during the first five weeks."  *Id.* at 860.  Again, Brown did not breach this provision, and Plaintiffs do not claim that it did.  Plaintiffs did not leave the University, and none alleges that they changed their enrollment status as a result of the pandemic.  To the contrary, each remained enrolled at Brown, took their courses, completed their work, and earned course credits for the semester.

The best Plaintiffs can do is to quote snippets from various course descriptions in the Bulletin, Compl. ¶¶ 41–58—e.g., the engineering course that refers to "using research tools available on campus" and the biology courses that offer "hands-on experience."  ***First***, the motion to dismiss challenges whether these three Plaintiffs have stated a valid claim, and there is no allegation that any of them took the courses cited in the snippets.  Even if a course description were a specific promise—and it's not—a description for a course that no Plaintiff selected is not a promise any of them accepted.  ***Second***, the snippets are misleading.  Plaintiffs do not allege that any of the snippets, even if they were contractual, were actually breached.[21]  ***Third***, to the extent that some course descriptions refer to classroom instruction, these references are not specific promises.[22]  Absent specific promises, as *Gorman* held, the "unique" character of

---

[21]   Each snippet must be read in context.  For example, the complete sentence excerpted by Plaintiffs as to one of the engineering courses states, "Students will also have the opportunity *to gain an introduction* to several nano-engineering research tools available on campus."  Ex. A at 168.  Plaintiffs do not allege that students in the course did not "gain an introduction" to those research tools.

[22]   In *Bass v. Miss Porter's School*, the plaintiff parents alleged that the student handbook and the school's *in loco parentis* status gave rise to an implied contract that the school would care

student-university contracts is that courts "must construe them in a manner that leaves the school administration broad discretion to meet its educational … responsibilities."  853 A.2d at 34.

**Fourth**, to treat a faculty member's course description as a binding commitment of the university would lead to absurd results.  One course description states that it will "produce a space of trust that allows debating hard questions and challenging our own assumptions, and encouraging collective thinking and cooperative learning."  Ex. A at 337.  Could a student sue for breach of contract if the student felt that the questions were not "hard" or that the class encouraged "group-think," not cooperative learning?  **Finally**, the law is that courts "interpret [student-university] contractual terms in accordance with the parties' reasonable expectations, giving those terms the meaning that the university reasonably should expect the student to take from them" and "not read[ing] terms into the contract."  *Doe v. Brown Univ.*, 166 F. Supp. 3d 177, 191 (D.R.I. 2016).  But students should reasonably expect that courses, professors, meeting times, examination times, readings, etc. may differ from the original course descriptions—even in normal times.  *See Cuesnongle v. Ramos*, 713 F.2d 881, 885 (1st Cir. 1983) ("Even to think that a university could be found to have broken its contract when it changed the dates of classes, or the curriculum, for reasons beyond its control, or changed teachers, should startle anyone at all familiar with university life."); *Paynter*, 319 N.Y.S.2d at 893 (referring to the suspension of classes as "[t]he

---

for their child's emotional and physical needs.  738 F. Supp.2d at 325.  Rejecting that claim, the court pointed to "the difference between a parent's 'implied understanding' and an 'implied contract' between the parent and the school sufficiently specific to give rise to a cognizable cause of action."  *Id.* at 326.  Likewise here, a student's implied understanding regarding in-person, on-campus instruction is insufficiently specific to create an implied contract.

insubstantial changes made in the schedule" and concluding that it "does not permit a recovery of tuition").[23]

**The website.** Ten paragraphs of the Complaint refer to various statements on Brown's website (or in promotional materials) about the campus and the attractions of life in Providence. *See* Compl. ¶¶ 38–48. But Plaintiffs do not allege that these materials, or anything said in them, constitute a contract, nor could they. Plaintiffs' caption for those ten paragraphs is "Background." It is the next section of the Complaint, ¶¶ 49–58, that is captioned, "Plaintiffs Contracted with Defendants For On-Campus Classes," and there Plaintiffs rely on statements in the Bulletin. In any event, the kinds of statements made on the website—a "classic New England College experience," *id.* ¶ 43, "memorable moments … outside the classroom," *id.* ¶ 44, Providence as "known for its restaurants, innovative arts scene, youthful energy and unpretentious vibe," *id.*—are puffery, not enforceable contractual promises. *G. v. Fay School*, 931 F.3d 1, 12 (1st Cir. 2019); *Gillis v. Principia Corp.*, 832 F.3d 865, 873 (8th Cir. 2016) ("These 'aspirational' promises … cannot form the basis of a breach of contract claim."); *Shin v. Mass. Inst. of Tech.*, No. 020403, 2005 WL 1869101, at *7 (Mass. Super. Ct. June 27, 2005) (holding "generalized representations" were "too vague and indefinite to form an enforceable contract").

---

[23]   As a practical matter, allowing contract claims to be brought based on course descriptions would result in a massive administrative burden. The university's legal department would be forced to (i) review and approve every course description; (ii) eliminate any subjective or aspirational content or any expectation that might be modified in the event of weather changes or any other possible event during the semester; (iii) include disclaimers about possible changes of faculty due to illness or retirement or leaving to teach at another university, or cancellation by expected guest speakers; and (iv) follow-up to ensure the descriptions were met "to the tee."

B.     **No Breach of an Implied Promise**

The Amended Complaint adds a new cause of action for breach of implied contract.  In

the absence of any specific, identifiable promise, however, there can be no agreement, express or

implied.  "An implied contract depends on actual agreement, and the party charged must have

agreed, either by words or action or conduct, to undertake a contractual commitment to the party

seeking to enforce such a commitment. Like an express contract, an implied contract requires a

meeting of the minds between the parties." *Bass*, 738 F. Supp. 2d at 325 (quotations omitted);

*see also Opella v. Opella*, 896 A.2d 714, 720 (R.I. 2006).

As support for this implied contract, Plaintiffs allege that "[i]t was the reasonable

expectation of Plaintiffs … that Defendants would provide them with on-campus … classes and

instruction … in accordance with Defendants' publications … and Defendants' usual and

customary practice of providing on-campus courses."  Compl. ¶ 101.  To be sure, the implied

contract that governs any student-university relationship is construed by the courts in light of the

reasonable expectation.  But that expectation is defined by the official university publications,

*Mangla*, 135 F.3d at 83 ("The terms of the contract may include statements provided in student

manuals and registration materials") (citation omitted), and it is the university's own reasonable

expectation of how the term will be understood that governs, *id.* ("The proper standard for

interpreting the contractual terms is that of reasonable expectation—what meaning the party

making the manifestation, the university, should reasonably expect the other party to give it.")

(quotation omitted).

Plaintiffs' claim therefore misses the mark in two respects.  First, although not a contract,

the Bulletin defines Brown's reasonable expectation about what tuition pays for and when it will

be refunded.  It defines, in other words, what Brown should reasonably expect students to

understand about tuition.  To begin with, Brown can reasonably expect that students will read the

15

Bulletin.  And, when they do, the Bulletin specifically tells them that the university (i) will refund tuition only if a student withdraws within the first five weeks of the semester and, if they successfully complete the course work and (ii) will grant credit for up to five courses per semester toward a degree.  As the First Circuit held in *Mangla*, "[b]ecause the provision was included in the graduate school catalog, Brown could reasonably expect students to be aware of the policy."  *Id*.  In *Mangla*, because the catalog contained a specific policy regarding admission to the graduate program, "it was reasonable for Brown to expect its students not to rely on oral statements by individual faculty members as binding promises by the university."  *Id*.  Here, substitute "the Bulletin" for "the graduate school catalog."  Because the Bulletin contains a specific policy about tuition refund, it is reasonable for Brown to expect students to rely on that policy and not course blurbs or descriptions of campus life and the attractions of Providence.

Second, Plaintiffs conflate a reasonable expectation as to what a semester at almost any college would look like in a pandemic-free world with a reasonable expectation based on any promise made to Plaintiffs by Brown.  As a general rule, the implied student-university contract is that "if the student complies with the terms prescribed by the university, she will obtain the degree she seeks."  *Gally v. Columbia Univ.*, 22 F. Supp. 2d 199, 206 (S.D.N.Y. 1998); *Papelino v. Albany College of Pharmacy of Union Univ.*, 633 F.3d 81, 93 (2d Cir. 2011).  There is no allegation here that Brown has not awarded credit to Plaintiffs for their Spring 2020 course work—and, indeed, one Plaintiff has graduated and been awarded her degree, and the other two advanced toward their degrees with the credits they earned that semester.  Plaintiffs have alleged no specific promise made by Brown to provide in-person, on-campus education.  *Doe v. Brown Univ.*, 166 F. Supp. 3d at 191 ("[C]ourts may not read terms into the contract.").  Accordingly, Plaintiffs do not and cannot state a claim for breach of an express or implied contract.

16

**III.     Plaintiffs Do Not State a Claim for Unjust Enrichment.**

Plaintiffs plead unjust enrichment "in the alternative" to their breach of contract claims. As an initial matter, the claim fails because the Complaint alleges nothing to suggest that Brown was actually ***enriched*** by sending most students home and having them complete the semester through remote instruction, let alone that Brown was ***unjustly*** enriched.[24]  Plaintiffs acknowledge that Brown remained open and that each completed the semester and each earned credits toward their degrees.  Compl. ¶¶ 11–13.  They point to no purported cost savings to Brown, and they ignore the obvious additional cost Brown had to incur to continue operations during a pandemic. The claim thus fails on its face.

In any event, it is settled law that a plaintiff cannot maintain a quasi-contractual claim (like unjust enrichment) when the relationship is contractual.  *Doe v. Brown Univ.*, 166 F. Supp. 3d at 196 ("Both parties acknowledge that a promissory estoppel claim [a quasi-contractual claim] only stands in the absence of a contract."); *Café La France, Inc. v. Schneider Sec., Inc.*, 281 F. Supp. 2d 361, 375 (D.R.I. 2003); *Mehan v. Gershkoff*, 230 A.2d 867, 870 (R.I. 1967); *Cazabat v. Metro. Prop. & Cas. Ins. Co.*, No. C.A. KC99-0544, 2000 WL 1910089, at *7 (R.I. Super. Ct. Apr. 24, 2000).  Rhode Island law permits pleading equitable claims "in the alternative" only when there is "an allegation that the contract is unenforceable."  *Rocha v. Wells Fargo Bank, N.A.*, No. 16-cv-600, 2018 WL 1934191, at *5 (D.R.I. Apr. 24, 2018); *Hasbro, Inc. v. Mikohn Gaming Corp.*, 491 F. Supp. 2d 256, 264 (D.R.I. 2007) ("Unjust enrichment, like other quasi-contractual remedies, is a vehicle for equitable recovery where no rights on an

---

[24]   *Ciampi v. Zuczek*, 598 F. Supp. 2d 257, 263 (D.R.I. 2009) ("Simply conferring a benefit ... is not sufficient to establish a claim for unjust enrichment. The most significant requirement ... is that the enrichment to the defendant be unjust.") (quoting *R & B Elec. Co. v. Amco Constr. Co.*, 471 A.2d 1351, 1356 (R.I. 1984)).

enforceable contract exist." (citing 26 Richard A. Lord, Williston on Contracts § 68:5 (4th ed. 2004))). But here, as in *Doe*, "there is no dispute that the student-university relationship is governed by contract." 166 F. Supp. 3d at 196. As explained in Part II.B above, the implied contract that governs every student-university relationship provides that "if the student complies with the terms prescribed by the university, she will obtain the degree she seeks." *Gally*, 22 F. Supp. 2d at 206. That implied contract is enforceable, but Plaintiffs do not allege that Brown breached it. Thus, because there is an enforceable contract, the unjust enrichment claim must be dismissed.

## IV.    Plaintiffs Do Not State a Claim for Conversion.

Plaintiffs' attempt to repackage their contract claim into one for conversion fails as a matter of law. *Rocha*, 2018 WL 1934191, at *5. A valid conversion claim involves personalty. *Fuscellaro v. Indus. Nat'l Corp.*, 368 A.2d 1227, 1230 (R.I. 1977) ("[T]he gravamen of an action for conversion lies in the defendant's taking the plaintiff's ***personalty*** without consent and exercising dominion over it inconsistent with the plaintiff's right to possession."); *Alex & Ani, LLC v. Elite Level Consulting, LLC*, 31 F. Supp. 3d 365, 371 (D.R.I. 2014) ("To maintain an action for conversion, [a] plaintiff must establish that she was in possession of the ***personalty***, or entitled to possession of the ***personalty***, at the time of conversion." (first and second emphases added) (quoting *Montecalvo v. Mandarelli*, 682 A.2d 918, 928 (R.I. 1996))). Plaintiffs' claim, however, does not involve personalty; it concerns a right of access and/or the payment of money, which generally cannot provide the basis for a conversion claim subject to limited exception, none of which apply here.

In asserting a claim for conversion, Plaintiffs allege that they "had an undisputed right to receive educational services, activities, and access Defendants' facilities for the Spring 2020 term" and that "Defendants wrongfully exercised control over and/or intentionally interfered

with the rights of Plaintiffs and Class Members by effectively closing its campus to in-person education and switching to an online-only format, discontinuing paid-for services, and evicting students from campus housing."  Compl. ¶¶ 121–22.  This alleged right, however, admittedly has to do with receiving educational services, taking advantage of university activities, and having access to university facilities.  It does not involve Plaintiffs' personalty, so there was nothing for Brown to convert.  *See* Black's Law Dictionary, Personalty (11th ed. 2019) (defining personalty as "[p]ersonal property").

Plaintiffs also fail to state a valid claim for conversion because money cannot be the subject of a conversion claim unless it is specifically identifiable.  *DeChristofaro v. Machala*, 685 A.2d 258, 263 (R.I. 1996) (if a contract places "no obligation upon defendant to keep intact *in specie* the money paid by plaintiffs … title to [the] money passe[s] to defendant at once upon delivery").  Plaintiffs do not allege that there was any contractual term that obligated Brown to hold each Plaintiff's tuition payments separate and apart for any purpose, much less to pay refunds.   Put succinctly:  "the money belonged to [Brown] upon its delivery, and, consequently, [it] could not convert it."  *Id.*  Plaintiffs have failed as a matter of law to plead a plausible claim of conversion and thus the claim should be dismissed.

## CONCLUSION

For these reasons, the Court should dismiss the First Amended Class Action Complaint.  Plaintiffs have already amended the complaint once, and added substantial amendments beyond the identification of the original John Doe plaintiff.  Because the Plaintiffs cannot as a matter of law state a claim for relief under any of their theories, especially given the courts' deference to Brown to make matters of academic judgment, further amendment would be futile.  Accordingly, the Amended Complaint should be dismissed with prejudice.  *See Glassman v. Computervision*

*Corp.*, 90 F.3d 617, 623 (1st Cir. 1996); *Bond Opportunity Fund II, LLC v. Heffernan*, 340 F.

Supp. 2d 146, 156, 160 (D.R.I. 2004).

Date:  August 24, 2020

Respectfully submitted,

By: _____

Mark S. Levinstein (*pro hac vice*)
Amanda M. MacDonald (*pro hac vice*)
WILLIAMS & CONNOLLY LLP
725 Twelfth Street, N.W.
Washington, DC  20005
Telephone: (202) 434-5000
Facsimile:  (202) 434-5029
mlevinstein@wc.com
amacdonald@wc.com

-and-

/s/ *Robert C. Corrente*
Robert C. Corrente (No. 2632)
Staci Kolb (No. 5451)
WHELAN CORRENTE & FLANDERS
LLP
100 Westminster Street, Suite 710
Providence, RI  02903
Telephone:  (401) 270-4500
Facsimile:  (401) 270-3760
rcorrente@whelancorrente.com
skolb@whelancorrente.com

*Attorneys for Defendants*

**CERTIFICATE OF SERVICE**

I hereby certify that the foregoing Memorandum in Support of Brown University's Motion to Dismiss the First Amended Class Action Complaint was served on all counsel of record on August 24, 2020, using the Court's ECF system, which will send a notification of such filing.

/s/ *Robert C. Corrente*
Robert C. Corrente