UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

| | |
|---|---|
| HYUN CHOI, ANNA HOUSE, and AMY PHAM, individually and on behalf of all others similarly situated, Plaintiffs, v. BROWN UNIVERSITY, Defendant. | C.A. No. 20-cv-191-JJM-LDA |

## MEMORANDUM AND ORDER

Before the Court is Defendant Brown University's Motion for Summary Judgment. According to Brown's Motion, the three named Plaintiffs[1] cannot sustain a claim for breach of contract because of a failure to refund fees they paid, and therefore Brown is entitled to judgment as a matter of law. The claims pertain to four classes of fees and charges: a Student Activity Fee, a Health Services Fee, a Nonresident Fee, and Room and Board Charges.[2] Plaintiffs oppose this Motion on grounds that each plaintiff, in one way or another, has lost the benefit of their contractual bargain, and there are disputes as to material facts whether Brown provided the services for which the Plaintiffs contracted.

---

[1] The Court has not certified this suit as a class action. Therefore, it will not extrapolate these claims as if they are representative of a group of unidentified individuals. The only claims before the Court now are those brought by the three named Plaintiffs.

[2] The Court dismissed the Plaintiffs' claim for breach of contract and unjust enrichment concerning a refund of tuition. ECF No. 44.

I.    **BACKGROUND**

The COVID-19 pandemic has been a global tragedy.  It has fundamentally and permanently altered the lives of individuals and their families.  It has forced organizations and institutions to adapt in ways that they could not have anticipated. It has forced this country to take drastic measures to meet the ever-changing disruptions posed by a constantly evolving virus.

In March 2020, the pandemic became the focal point for Brown and its students.  Early that month, Brown President Christina H. Paxson emailed all members of the Brown community informing them that Brown was cancelling classes for the week of March 16 and would resume in an online format beginning on March 30.  *See* ECF No. 59-6 at 2.  President Paxson added that if students resided in either on campus or Brown-owned housing, they would have to vacate their residence by March 22.  *Id.*  Brown moved this date up to March 17 when it reported its first COVID case among students.  ECF No. 22 at ¶ 67.

The three Plaintiffs were all Brown undergraduates at the time. Anna House was a senior in her last semester in March 2020.  ECF No. 55 at ¶ 51.  Ms. House had received a Federal Pell Grant and therefore did not pay tuition or fees for the semester out of pocket.  *See* ECF No. 59 at 3, n.1.

Plaintiff Amy Pham was a first-year student when the pandemic struck.  She received a partial scholarship for the Spring 2020 semester.  ECF No. 55 at 11, ¶ 66. Part of her cost of attending for this semester included a $4,710 Room Charge and a $2,956 Board Charge, the latter of which included a meal plan.  *Id.* ¶ 64.  Indeed,

because Ms. Pham was the only plaintiff to live on campus, she is the only plaintiff who paid a Room and Board Charge along with a Health Services Fee and a Student Activities Fee.

The final plaintiff, Hyun Choi, was a sophomore during the 2019–2020 academic year.  Because Mr. Choi did not live on campus, Brown charged him a Nonresident Fee, along with the Health Services Fee and Student Activities Fee.  Mr. Choi is the only plaintiff who remained at Brown after the start of the pandemic due to an inability to safely return to his home overseas.  *Id.* at ¶ 77.  And he is the only plaintiff who used Brown's Health Services during the pandemic, as he filled prescriptions many times.  *Id.* at ¶ 80.

All three Plaintiffs allege that, because of their rapid and forced departure from Brown's campus, they paid for services that Brown did not deliver, thereby breaching contractual obligations.

## II.  STANDARD OF REVIEW

Fed. R. Civ. P. 56 controls in deciding whether a party is entitled to summary judgment.  "The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56.  More particularly,

> the plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.

*Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). When deciding whether the Court should grant summary judgment, the Court must "view the facts in the light most favorable to the nonmoving party, drawing all reasonable inferences in that party's favor." *Barbour v. Dynamics Rsch. Corp.*, 63 F.3d 32, 36 (1st Cir. 1995).

As alluded to, there must first be no genuine issues of material fact. "[M]ere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986) (emphasis in original). Thus, the issue must be genuine and material. *See id.* "In this context, 'genuine' means that the evidence about the fact is such that a reasonable jury could resolve the point in favor of the nonmoving party. . . . '[M]aterial' means that the fact is one that might affect the outcome of the suit under the governing law." *Morris v. Gov't Dev. Bank of Puerto Rico*, 27 F.3d 746, 748 (1st Cir. 1994) (citations omitted) (internal quotation marks omitted).

Additionally, the moving party must be entitled to judgment as a matter of law. The moving party is "entitled to a judgment as a matter of law because the nonmoving party has failed to make a sufficient showing on an essential element of her case with respect to which she has the burden of proof." *Celotex*, 477 U.S. at 323. The Court decides this latter element of the summary judgment standard by evaluating "whether there is [evidence] upon which a jury can properly proceed to find a verdict for the party producing it, upon whom the *onus* of proof is imposed." *Anderson*, 477 U.S. at 252 (emphasis in original) (internal quotation marks omitted).

## III.   DISCUSSION

The basic principles of contract law govern Plaintiffs' claims.  In Rhode Island, as is true in many other jurisdictions, "a student and private university relationship is essentially contractual in nature."  *Gorman v. St. Raphael Acad.*, 853 A.2d 28, 34 (R.I. 2004).  The Court must, therefore, establish the landscape of contract law to determine whether a reasonable jury could conclude that there was a breach of contract.

Contract law is a state law doctrine.  *See Ogden v. Saunders*, 25 U.S. 213, 325 (1827).  "[T]he remedy for a breach of a contract is governed by the lex fori," or the law of the forum.  *Nowell v. Waterman*, 163 A. 402, 403 (R.I. 1932).  The Court will therefore look to Rhode Island law for this landscape.

"A contract is an agreement which creates an obligation.  Its essentials are competent parties, subject matter, a legal consideration, mutuality of agreement, and mutuality of obligation."  *Lamoureux v. Burrillville Racing Ass'n*, 161 A.2d 213, 215 (R.I. 1960) (internal quotation marks omitted).  "Under traditional contract theory, an offer and acceptance are indispensable to contract formation, and without such assent a contract is not formed." *Smith v. Boyd*, 553 A.2d 131, 133 (R.I. 1989).  The Rhode Island Supreme Court "has established that for parties to form a valid contract, each must have the intent to be bound by the terms of the agreement." *Weaver v. American Power Conversion Corp.*, 863 A.2d 193, 198 (R.I. 2004) (citing *Rhode Island Five v. Medical Assocs. of Bristol County, Inc.,* 668 A.2d 1250, 1253 (R.I. 1996)).

Together with offer and acceptance, there must be consideration. "To determine consideration, the Restatement (Second) of Contracts § 71 (1981) employs a bargained-for exchange test. Under this test, something is bargained-for 'if it is sought by the promisor in exchange for his promise and is given by the promisee in exchange for that promise.'" *Filippi v. Filippi*, 818 A.2d 608, 624 (R.I. 2003). This constitutes a mutuality of obligation, which is fundamental in bilateral contracts. *See JPL Livery Servs., Inc. v. Rhode Island Dep't of Admin.*, 88 A.3d 1134, 1143 (R.I. 2014). Of note, "termination clauses supported by adequate consideration are not illusory," and are therefore enforceable. *See id.*

If a party does not fulfill their contractual obligations, they have breached the contract, and the nonbreaching party may sue for the breach. *See Rendine v. Catoia*, 158 A. 712, 713 (R.I. 1932). To determine whether there has been a breach, the Court must look to the contractual obligations, which are illustrated by the plain language of the agreement. *See Zarrella v. Minnesota Mut. Life Ins. Co.*, 824 A.2d 1249, 1259 (R.I. 2003). "If the terms are found to be unambiguous, however, the task of judicial construction is at an end and the parties are bound by the plain and ordinary meaning of the terms of the contract." *Id.* "[W]hether a party has substantially performed or materially breached its contractual obligations is usually a question of fact to be decided by the jury. However, if the issue of materiality admits . . . only one reasonable answer, then the court should intervene and resolve the matter as a question of law." *Women's Dev. Corp. v. City of Cent. Falls*, 764 A.2d 151, 158 (R.I. 2001) (citations omitted).

As shown above, there are four fees and charges in question: Room and Board Charges; the Student Activity Fee; the Health Services Fee, and the Nonresident Fee. Taking the facts in the light most favorable to the nonmoving party, the Court will address each of these fees in turn.

### A.    Room and Board Charges[3]

When a student pays Brown for room and board, they must also agree to comply with the Brown's Housing Agreement.   This agreement constitutes the contractual obligations of the parties, where Brown provides housing and board, and the student agrees to comply with the terms of the Housing Agreement. *Cf. Doe v. Devonshire*, 181 F. Supp. 3d 146, 154–55 (D. Mass. 2016) (holding that a violation of the Student Code breached the university's Housing Agreement).   As is true with all contracts, a court will interpret the 2019–20 Housing Agreement according to its plain meaning. *See Zarrella*, 824 A.2d at 1259.

Amy Pham is the only plaintiff who paid Room and Board Charges.   There are two paragraphs in the Housing Agreement that are relevant to Ms. Pham's claims. Because they set forth different contractual obligations with different legal effects, the Court will address each individually.

---

[3] Room and board are two separate charges at Brown.   The former charge includes the actual housing in which on-campus students reside, while the latter charge includes supplemental expenses such as meal plans.   The Court treats them as a single charge for purpose of analyzing Brown's contractual obligations.

1. *Paragraph 5: Room Refunds*

The first relevant provision of the Housing Agreement is Paragraph 5, "Room Refunds." This paragraph describes refund procedures for "[s]tudents who need to withdraw from a term of study once it has begun . . . ." ECF No. 55-11 at ¶ 5. It then states that if Brown suspends or expels a student, they are "not entitled to any refund of room charges for the balance of the current semester." *Id.* Ms. Pham did not withdraw from Brown and did not face discipline for academic or behavioral misconduct. Therefore, this paragraph is not relevant to this dispute.

2. *Paragraph 9: Termination*

Likely recognizing the futility under Paragraph 5, Ms. Pham pleads her room and board claim under Paragraph 9 of the Housing Agreement. In its entirety, this paragraph is as follows:

> **Termination by the University.** The University reserves the right to terminate this Agreement and take possession of the room at any time for violation of this Agreement, violation of University policies which includes without limitation the Code of Student Conduct, and/or for reasons of order, health, safety, discipline, academic deficiency, disciplinary suspension or expulsion, or when the resident exhibits disruptive behavior. Students whose Agreement is terminated by the University are responsible for payment of all housing costs associated for the term in which the violation occurred. The University may terminate this Agreement on an interim basis, in which case the student shall be responsible for housing costs during the interim termination period. Students whose agreement is terminated on an interim basis must vacate the room and surrender all keys.

ECF No. 55-11 at ¶ 9 (emphasis in original). Because this is the crux of Ms. Pham's claim, it is worth parsing this paragraph piece by piece.

The opening, independent clause of the paragraph allows Brown to do two things, as illustrated by the conjunction "and." The first is that Brown reserves the right to terminate the Housing Agreement, and the second is that Brown may take possession at any time. The next word after any time, "for," sets forth the bases and therefore limitations by which Brown may take possession. And there are four enumerated instances in which Brown may take possession at any time. The first two are for violating the Agreement or university policy. The third rationale is the most critical: Brown may terminate its Housing Agreement with a student for health and safety reasons. The final reason is for disruptive behavior by a student. Taken collectively, there are two reasons that pertain to violations by students, and two reasons relating to extenuating circumstances that do not necessarily involve violations. Lastly, the paragraph also states that Brown may terminate the agreement on an interim basis, where students would have to turn in their keys and vacate their residence.

Ms. Pham's reading of the paragraph does not track its plain meaning: It is not the case that all four rationales relate to violations of university policy. When Brown terminates the Housing Agreement with a student, there need not have been a violation; Brown could do so for health and safety reasons. And no reasonable jury could conclude that the COVID-19 pandemic is not a health and safety reason.[4]

---

[4] That Brown could terminate the Housing Agreement on an interim basis supports this notion. Brown explicitly notes that the termination did not have to be for a violation and could be due to other grounds. For example, if there was an issue that rendered a student's residence uninhabitable, Brown could force the student to

Therefore, the Court finds that Brown did not breach its Housing Agreement with Ms. Pham because Brown retained the right to terminate the agreement for health and safety reasons.

Ms. Pham also presents a claim for unjust enrichment, claiming that she paid Brown for room and board for a semester and did not receive the benefit of her bargain, which unjustly enriched Brown. A person making a claim of unjust enrichment under Rhode Island law must prove:

> (1) that he or she conferred a benefit upon the party from whom relief is sought; (2) that the recipient appreciated the benefit; and (3) that the recipient accepted the benefit under such circumstances 'that it would be inequitable for [the recipient] to retain the benefit without paying the value thereof.

*Dellagrotta v. Dellagrotta*, 873 A.2d 101, 113 (R.I. 2005) (alterations in original) (citing *Bouchard v. Price*, 694 A.2d 670, 673 (R.I. 1997)).

Here, Ms. Pham conferred a benefit on Brown by paying money toward room and board, and Brown, receiving such funds, appreciated the benefit of the payment. It would be inequitable for Brown to retain the payment for housing and food that it did not provide (albeit for a reason out of its control, such as the pandemic).

Nonetheless, Brown provided all students with a fifty percent refund of the room and board charges they paid for the semester.[5] ECF 55-4 at ¶ 6. All parties agree that Brown closed the residences and dining halls at the halfway point of the semester. In Ms. Pham's case, Brown gave her a partial refund of $660.15 housing

---

vacate until it resolved the issue, confirming that Brown is not confined to violations as reasons for termination under the four conditions in this paragraph.

[5] Students who lived off campus received a credit. ECF 55-4 at ¶ 6, n.1.

credit and a \$414.31 dining credit.  ECF No. 55-19 at 2.  Brown calculated this amount
(for all students receiving financial aid) by prorating "based on the individual parent
contribution to the standard annual costs of attendance . . . ."  ECF No.  55 at ¶ 50
(internal quotations omitted).

Because Brown refunded Ms. Pham the amount of benefit she conferred on
Brown, Ms. Pham does not have a claim for unjust enrichment.[6]  As a result, there
is no dispute as to a material fact that Brown upheld its contractual obligations
regarding the Housing Agreement.  Therefore, the Court must GRANT summary
judgment for Brown on the Room and Board Charges.

### B.    The Student Activity Fee

Brown requires all undergraduate students to pay a Student Activity Fee of
\$143 per semester.  ECF No. 55-1 at ¶ 3.  The Brown Bulletin provides that the
Student Activity Fee "is charged to all students for the support of registered student
organizations, the activities of the Undergraduate Council of Students, and the
Student Union."  ECF No. 55-6 at 3.  For example, "the Student Activity fee is used
to support Brown's more than 400 student organizations."  ECF No. 55-1 at ¶ 4.
Brown then takes those funds and provides them "to the student-run Undergraduate
Finance Board ("UFB"), which in turn allocate[s] the funds in its discretion to support
the hundreds of student organizations at Brown."  ECF No. 55 at ¶ 12.  "The UFB's

---

[6] The parties argue over whether Brown should refund a student on financial
aid a full refund, not prorated for financial aid.  The Court need not reach that
argument because it is only applicable to a breach of contract claim, and the Court
has ruled that Brown did not breach the contract.

historical practice is that any funds that were allocated to a particular student organization, but were not used, are returned to UFB at the end of each semester. The UFB then carries over unspent funds to the next academic year." ECF No. 55-1 at ¶ 6.

Brown's Senior Associate Dean and Director of Student Activities Joie Steel, in her affidavit, demonstrates that the use of the Student Activity Fee was no different in the Spring 2020 than its historical use:

> In the Spring 2020 semester, as it does each semester, Brown provided the money generated from the Student Activity fee charged to students of the semester to the UFB. After the Pandemic began, and as is typical, the student organizations sought funding from the UFB as they determined necessary for their organizations, and the students on the UFB then determined how the funding would be spent to support those organizations over the course of the spring semester.

*Id.* at ¶ 8. She continues:

> As it had done historically, the UFB decided that it would carryover the unspent funds for support of student organizations and activities in the 2020–2021 academic year. In recognition that the Class of 2020 would not benefit from the funds carried over to 2020–2021, the UFB decided to transfer a portion of the unspent funds—$60,000—to Alumni Relations for the Class of 2020 to fund those students' future alumni events. In addition, the UFB recommended that Brown not charge the Student Activity fee in the 2020–2021 academic year. Brown accepted that recommendation.

*Id.* at ¶ 9.

Plaintiffs' claims for breach of contract and unjust enrichment from the Student Activity Fee must fail for three reasons.

First, there is no indication that Brown administered the funds differently than they had in the past. To the contrary, Brown used the funds in the same manner

12

as in previous years. For example, after the pandemic began, if a student organization requested funds, the UFB disbursed those funds to the organization as the UFB found necessary. In this sense, Brown and the UFB still used the funds to "support" student organizations, as provided in the Brown Bulletin.

Secondly, and relatedly, the UFB used these funds in the Spring of 2020 to support student organizations and their activities, regardless of whether student events took place in person or online. *See* ECF No. 54 ¶ 10.

Finally, as is customary, the UFB rolled over the unused funds to the following academic year. Students did not have to pay the Student Activity Fee for the next year, thereby ensuring that the funds that were allocated, in part, for the Spring 2020 semester would carry over to student organizations in the immediate future. Thus, all returning students would receive the benefit of their previous bargains in the following academic year. Relatedly, seniors who were not returning nonetheless received the benefit of their bargain through an alumni gift of $60,000 to support their in-person graduation the following year.

Therefore, the Court finds that Brown did not breach contract, nor was it unjustly enriched. It did not act any differently than it would have if the pandemic had not occurred. In the Spring of 2020, Brown gathered all the Student Activity Fees, provided those moneys to the UFB, who, in their discretion, administered the funds to the over four hundred student organizations on campus throughout the semester. Plaintiffs have not shown that those organizations were not supported by the Student Activity Fees, especially where the UFB carried over a sizable portion of

those fees to the following academic semester.[7]  *Cf. Fiore v. University of Tampa*, No. 20-CV-3744 (CS), 2021 WL 4925562 at *17 (S.D.N.Y. Oct. 21, 2021) (holding that a plaintiff who does not claim that student organizations were not supported will not have a claim for breach on a student activity fee).  Thus, the Court must GRANT summary judgment for Brown on the Student Activity Fee.

### C.   Health Services Fee

Brown required all "actively enrolled, degree-seeking students" to pay a $471 Health Services Fee for the Spring 2020 semester.[8]  ECF No. 55-2 at ¶ 3–4.  The Health Services Fee is distinct from health insurance coverage, and supplies Health and Wellness with much of its operating budget.  *See id.* at ¶ 6–7.  Some of those services include: confidential, urgent, and primary medical care with a 24-hour nurse; Emergency Medical Services ("EMS") with rapid-response to on-campus emergencies; mental health services, including personal counseling, programming, and crisis stabilization with Counseling and Psychological Services ("CAPS"); and other well-being needs such as alcohol, interpersonal violence, and general self-care workshops. *See id.* at ¶ 7.

In March 2020, many of these services transitioned to a telehealth platform to accommodate the needs of students despite the exigencies created by the pandemic.

---

[7] In this sense, even if the UFB did not use the funds in the Spring 2020 semester, the UFB would use them the next year and Brown waived the next Student Activity Fee for 2020–21, thereby preventing unjust enrichment from occurring.

[8] Brown may waive this fee in extraordinary circumstances.  Those extraordinary circumstances did not exist for any of the plaintiffs because none of them qualified for or requested a waiver.  ECF No. 55-2 at ¶ 5.

*See id.* at ¶ 9. "Health care providers . . . continue[d] to be available to speak with patients about their health concerns, and if necessary, arrange . . . scheduled appointment[s] on site or via telehealth communications." *Id.* at ¶ 9 (internal quotations omitted). To this end, only thirty employees transitioned to remote work, while seventy-six remained on campus to provide students with requested medical attention. *See id.* at ¶ 10.

From these facts, there is no evidence that, during the Spring 2020 semester, Health Services was unavailable to provide medical attention to students. The evidence is to the contrary. Brown recorded 8,607 patient encounters throughout the remainder of the semester, roughly equal to the number of patient encounters before the pandemic (i.e., in January and February). *See id.* at ¶ 10. These included telehealth visits, laboratory reference tests, and EMS responses. The number of CAPS appointments even increased, as did the number of workshops and support groups offered to all students. *See id.* at ¶ 10. And the Health Services' pharmacy filled 4,210 prescriptions in March, April, and May 2020.

Plaintiffs paid for a service, and reasonably expected those services to be available if they needed them. To the extent that this does constitute a contract, there is no evidence that Brown failed to adhere to its contractual obligations. Not only did Health Services remain open, but it also continued to provide the same services that it would have if Brown had been open.[9] In some capacities, Health

---

[9] For example, Plaintiff Choi was able to fill prescriptions with the Health Services pharmacy. *See id.* at ¶ 10, 12.

Services actually increased the number of services it provided.   The evidence is undisputed that Plaintiffs obtained the benefit of their bargain.[10]

Therefore, because Health Services remained open and continued to provide their services to Brown students, no reasonable jury could find that Brown breached their contractual obligations.   As a result, the Court must GRANT summary judgment for Brown regarding the Health Services Fee.

### D.   Nonresident Fee

The final fee is the Nonresident Fee, which only students who do not live on campus pay.   The funds generated by this fee "provide[] operating budget support for direct resources and services to students, provided through the Division of Campus Life, that are used by all students."   ECF No. 55 at ¶ 33.   These services include, for example, an on-call administrator that is available 24/7; the LGBTQ Center; Brown Center for Students of Color; Office of the Chaplains and Religious Life; Brown Center for Students of Color; the Sarah Doyle Center for Women and Gender; and Global Brown Center for International Students.   *See* ECF 55-3 at ¶ 10.   During the pandemic, Campus Life at Brown continued to provide all the services by these centers and offices.   *See id.*

For the Spring 2020 semester, the Nonresident Fee amount was $443.50.   *Id.* at ¶ 3.   "No student may opt out of paying the Nonresident fee on the basis they do

---

[10] Plaintiffs contend that they bargained for in-person medical assistance.   The facts do not support such a claim.   They bargained for services, not the medium through which Brown conducted those services.

not use some or all of the services and resources provided by the Division of Campus Life." *Id.* at ¶ 5. Although Faunce House closed, Brown and its centers continued to provide the services to the Brown community, with services and resources often being available remotely. *See* ECF No. 55-3 at ¶ 10. And most critically, Brown's Department of Public Safety, which provides safety and security throughout the Brown community, continued to operate on campus, and provide virtual programing throughout the latter half of the semester. *See id.* at ¶ 11.

For the Court to grant summary judgment for Brown, there must be no dispute as to a material fact that Brown did not provide the services that students contracted for. And yet, once again, there is no dispute that Brown provided these services.[11]

When the Plaintiffs paid the Nonresident Fee, they expected the services that they paid for would be available. There is no dispute that the services supported by the Nonresident Fee remained available to all students. Therefore, the Court GRANTS summary judgment for Brown as to the Nonresident Fee.

## IV.   CONCLUSION

There is no question that the exigencies raised by COVID-19 have proven difficult for both students and educational institutions. Plaintiffs contracted with Brown to provide certain services in the Spring 2020 semester. There is no evidence that Brown did not provide the services for which the students contracted. Although

---

[11] In fact, Plaintiffs incurred a benefit at the hands of Brown's response to the pandemic. For example, Plaintiff Choi sought and received permission to remain on campus due to the prevalence of COVID-19 in South Korea, his other residence. *See* ECF No. 55-3 at ¶ 9.

the services took on a different form than either party could have reasonably anticipated at the start of the semester, there is no evidence that Brown breached its contract with Plaintiffs or was unduly enriched. As a result, the Court GRANTS Defendant's Motion for Summary Judgment as to all counts.  ECF No. 51.

IT IS SO ORDERED.

_____
John J. McConnell, Jr.
United States District Judge

March 22, 2022